640 S.E.2d 129

William L. SEDGMER, Jr., et al., Plaintiff Below, Appellant,

v.

McELROY COAL COMPANY; Consolidation Coal Company; Consol, Inc.; and Eugene L. Saunders, Defendants Below, Appellees.

No. 32960.

Supreme Court of Appeals of West Virginia.

Submitted: Oct. 4, 2006.

Decided: Oct. 27, 2006.

Dissenting Opinion of Justice Starcher Dec. 12, 2006.

Ronald W. Kasserman, Esq., Kasserman & Bowman, PLLC, Wheeling, for Appellant.

James R. Miller, Esq., Rodger L. Puz, Esq., Dickie, McCamey & Chilcote, P.C., Pittsburgh, PA, for Appellees.

PER CURIAM.

This case is before the Court on appeal from a January 31, 2005, Order of the Circuit Court of Marshall County, which granted summary judgment in favor of Appellees in Appellant's deliberate intention action. This Court has before it the petition for appeal, the response to the petition, the briefs of the parties, and all matters of record. Following the arguments of the parties and a review of the record herein, this Court finds that the circuit court did not err in granting summary judgment. Accordingly, this Court affirms the January 31, 2005, Order of the circuit court.

## I.

### FACTS

In October of 1987, following a rail haulage fatality at its Osage Mine, Consolidation Coal Company issued new "Underground Rail Transportation Procedures" for all underground operations or main line haulage where 38–ton or larger locomotives are in use. Those procedures included a provision whereby it was established that:

> When clearing up or waiting in a passing track in order to allow trips of loads or empties to pass, all individuals are required to dismount all rail equipment smaller than 38 ton locomotives and position themselves in a safe location; e.g., crosscut, shelter hole, unless such equipment is parked in a designated safe area or oncoming traffic is traveling with the switch.

A year later, the McElroy Coal Company (a division of Consolidation Coal Company), established certain "Haulage Safety Rules and Procedures," which included the following:

> Vehicles stopped waiting for clearance— are to make sure that they are back in a switch at a safe location. When clearing up or waiting in a passing track, in order to allow trips of loads or emptys [sic] to pass, all individuals are required to dismount all rail equipment smaller than a 38 ton locomotive and position themselves in a safe location—crosscut, shelter hold unless such equipment is parked in a designated safe area or oncoming traffic is traveling with the switch.

On July 28, 1994, Appellant was working at a mine owned by McElroy Coal Company. He and his co-workers were passengers on three "man buses" which had stopped on the 3 North passway waiting for a train loaded with coal to pass on the main line. As the coal car traveled on the main line, a piece of tubing sprung up from out of the coal load in the thirteenth or fourteenth car and tripped an overhead toggle switch which controlled the track. As the cars still attached to the locomotive proceeded on the main line, the remaining cars were diverted onto the 3 North passway. A call came over the radio warning of the separation of the cars and a signal light in the passway changed from green to yellow, indicating the diversion. Foreman Eugene Saunders yelled for the passengers on the three man buses to jump to safety. Appellant was unable to disembark in time, and he suffered physical injuries to his left shoulder, left arm, and ribs when the man bus in which he was a passenger was struck by the diverted coal cars.

Appellant sued McElroy Coal, Consolidation Coal, Consol, and Saunders.[1] The suit against McElroy Coal, Consolidation Coal, and Consol centered around a "deliberate intention" cause of action. Following a period of discovery, Appellees filed a disposition motion seeking summary judgment. Appellees alleged that Sedgmer failed to prove each of the five elements of deliberate intent. The Circuit Court of Marshall County granted Appellee's motion for summary judgment, finding that the accident was a "singular incident" not indicative of a specific unsafe working condition. The court further concluded that Appellant's case against Appellees was no more than an attempt to turn a negligence claim into a deliberate intent action, which was simply not legally cognizable under West Virginia law. Sedgmer now appeals.

## II.

### STANDARD OF REVIEW

We proceed, having held that "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). Furthermore, we observe that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963); Syl. Pt. 1, *Williams v. Precision Coil, Inc.*, 194 W.Va.

1. The complaint also included the Watt Car & Wheel Company; Mine Technik America, Inc.; National Castings, Inc.; and Unitrac Systems Incorporated. Those parties have previously settled Appellant's claims against them and/or were dismissed from the proceedings.

52, 459 S.E.2d 329 (1995). With these standards in mind, we turn to the case before us.

## III.

## DISCUSSION

Appellant argues that the circuit court erred in granting summary judgment because the evidence creates a genuine issue of material fact as to whether a specific unsafe working condition existed (i.e., parking an occupied man bus too close to a railroad track switch in an underground mine), whether the Appellees had a subjective knowledge and appreciation of that specific unsafe working condition, and whether that specific unsafe working condition violated a specific safety regulation. Appellant stresses that there is a dispute as to how far from the switch the man bus was located at the time of the accident. Appellant asserts that this goes straight to the heart of whether there was a specific unsafe working condition given that, according to the mine's safety regulations, a stopped passenger vehicle weighing less than 38 tons awaiting clearance must be positioned in a "safe location" near a cross-cut or a shelter hole and that all passengers in that vehicle must disembark and find safety in the cross-cut or shelter hole. Appellant asserts that Appellees must have had a subjective realization of this unsafe working condition because the coal company specifically put this safety regulation into effect after two prior train derailment accidents. Appellant further points out that the West Virginia Board of Coal Mine Health & Safety Legislative Rules find that "[w]hen in the vicinity of a switch, all persons shall get into an area of safety, either in a shelter hold or a crosscut, when trips are approaching." 36 C.S.R. 33–4–1.

Appellees, on the other hand, argue that the evidence shows that the situation herein amounted to a "singular extraordinary and unexpected accident" that does not rise to the level of a specific unsafe working condition; that the Appellees had no subjective realization and appreciation of a specific unsafe working condition; and that there was no violation of a specific safety statute, regulation, or industry standard. Appellees assert that this was a freak accident—"Rube Goldbergian," they say—and there is no way that it can be termed an unsafe working condition. The Appellees argue that they could not have foreseen or appreciated that a piece of tubing would find its way into a load of coal, that it would get pressed down by the leveler at the coal loading site, that it would then pop back up before coming to the overhead switch, and that it would trip the overhead switch causing the train to divert to the 3 North Passway. Appellees further argue that the man buses were parked a sufficient distance from the switch, and that no unsafe working condition existed there.

West Virginia law expressly provides an exemption from employee civil liability claims for work-related injuries to employers who are in good standing with the Workers' Compensation laws of the state W. Va.Code § 23–2–6 (1991). In 1994, West Virginia Code § 23–4–2(c)(2)(ii) provided, however, that an employer could lose this workers compensation immunity if:

The trier of fact determines, either through specific findings of fact made by the court in a trial without a jury, or through special interrogatories to the jury in a jury trial, that all of the following facts are proven:

(A) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;

(B) That the employer had a subjective realization and an appreciation of the existence of such specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by such specific unsafe working condition;

(C) That such specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of such employer, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation

or standard generally requiring safe workplaces, equipment or working conditions;

(D) That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C) hereof, such employer nevertheless thereafter exposed an employee to such specific unsafe working condition intentionally; and

(E) That such employee so exposed suffered serious injury or death as a direct and proximate result of such specific unsafe working condition.

This is the so-called "deliberate intention" statute.[2]

■ This Court has held that "[t]o establish 'deliberate intention' in an action under W. Va.Code § 23-4-2(c)(2)(ii) (1983), a plaintiff or cross-claimant must offer evidence to prove each of the five specific statutory requirements." Syl. Pt. 2, *Helmick v. Potomac Edison Co.*, 185 W.Va. 269, 406 S.E.2d 700 (1991), cert. denied 502 U.S. 908, 112 S.Ct. 301, 116 L.Ed.2d 244. The record shows a history of at least one prior derailment of cars in another mine. The record is unclear about any prior diversions of cars. Appellees were aware of a danger of collisions; however, they took measures to prevent such accidents from occurring as well as measures to promote the safety of their employees. There is no evidence in the record before the Court that the mine exposed its employees to an unsafe working condition in violation of any state or federal safety statute, rule, or regulation. While Consolidation Coal was initially cited for a violation of 36 C.S.R. 33-4.1, the West Virginia Office of Miners' Health, Safety & Training later reviewed the evidence. The Notice of Violation was subsequently vacated, with the Coal Mine Safety Board of Appeals noting that, "[t]he evidence indicates that the cited regulation was not violated as alleged in the Notice of Violation."

Moreover, there is no evidence that Appellees exposed Appellant to an unsafe working condition. On the contrary, Appellees made every effort to establish safety protocols to ensure the safety of their employees. Nonetheless, an accident still occurred.[3] It is an unfortunate reality that no employer will ever be able to prevent all possible accidents, no matter what its efforts. For that reason, the West Virginia Legislature enacted the Workers Compensation Act, at Chapter 23 of the West Virginia Code. This enactment included the aforesaid grant of immunity for employers in good standing from civil suit by injured employees. The Legislature also expressly provided that this immunity is not absolute in the area of "deliberate intention" injuries, setting forth mandatory requirements at W. Va.Code § 23-4-2(c)[4] which must be met before an employer's immunity is lost and an employee may recover outside the workers' compensation system. To underscore the exceptional nature of "deliberate intention" claims, the Legislature also expressly encouraged the summary disposition of such claims on motion absent an employee's ability to meet the requisite showing of proof on each and every statutory requirement for maintenance of a "deliberate intention" action. W. Va.Code § 23-4-2(c)(2)(iii)(B).[5]

■■ It is unclear why the men in the mine on that July day, including Appellant, did not disembark from the man buses as they had been instructed through the mine's safety regulations. Perhaps it was negligence on the part of the foreman to not instruct his men to stand clear; however, that is irrelevant to a discussion of deliberate intention. We have held that:

2. The statute has since been amended, but is, in sum and substance, the same statute today as it was in 1994. The new deliberate intention statute is found at W.Va.Code § 23-4-2(d)(2)(2005).

3. We observe that Appellee, Eugene Saunders, who was Appellant's foreman, was exposed at all relevant times herein to the same potential risks as Appellant. There is no indication that can be gleaned from the record that Mr. Saunders intended himself or anyone else to be injured.

4. That is, the mandatory requirements are at W. Va.Code § 23-4-2(c) in the 1994 Code. Those requirements are now at W. Va.Code § 23-4-2(d).

5. Likewise, the requirement of showing proof of each element is at W. Va.Code § 23-4-2(c)(2)(iii)(B) in the 1994 Code. Those requirements are now at W. Va.Code § 23-4-2(d)(2)(iii)(B).

The legislature has plainly indicated the type of allegations which do not sustain a cause of action under W.Va.Code § 23–4–2(c)(2)(i) (1994), which specifically provides that a cause of action under its provision may not be satisfied by an allegation of (A) conduct which produces a result that was not specifically intended; (B) conduct which constitutes negligence, no matter how gross or aggravated; or (C) willful, wanton or reckless misconduct. The language of this provision demands overcoming a high threshold to establish a cause of action under W.Va.Code § 23–4–2(c)(2)(i). Syl. Pt. 8, *Tolliver v. Kroger Co.*, 201 W.Va. 509, 498 S.E.2d 702 (1997).

We agree with the findings and conclusions of the circuit court below. The record before us does not permit the inference that there existed here a specific unsafe working condition of which Appellees had a subjective realization and to which Appellees nevertheless intentionally exposed their employees, consistent with the requirements of West Virginia law.

## IV.

## CONCLUSION

Having established that there is insufficient evidence to support Appellant's "deliberate intention" cause of action on Appellees' dispositive motion, we affirm the circuit court's Order of January 31, 2005, granting summary judgment in favor of Appellees.

Affirmed.

STARCHER, J., dissenting.

I dissent because the majority opinion answered a question that was clearly a question of fact designated for trial by a jury. In so doing, the majority opinion has done nothing but make workplaces even more dangerous, and shields employers from responsibility for the employees who are crushed and killed by an employer's gross carelessness.

The undisputed facts in this case are simple. On July 28, 1994—deep inside a mine owned by the appellee, McElroy Coal Company—appellant William Sedgmer was sitting in one of three lightweight railroad passenger cars (called a "man bus") on the 3 North passway. Mr. Sedgmer was calmly twiddling his thumbs and waiting for a locomotive pulling fully-loaded freight cars to pass by on the main line tracks.

As these freight cars packed with tons of coal crawled upward out of the mine, debris hanging from one of the freight cars snagged an "overhead toggle switch," diverting the freight cars off of the main line and onto the 3 North passway.

Now—and this is a fact the majority opinion overlooks—this was not the first time the coal company had problems with these overhead toggle switches. For example, in 1989, a plank sticking up out of a fully-loaded freight car struck an overhead toggle switch. The tracks moved, and the freight cars jumped the tracks, plowed into a portal, knocked out power to a section of the mine and shut down production. In response to the 1989 wreck, the appellees replaced that one particular overhead toggle switch with a "paw" or "palm" type switch. But none of the other overhead toggle switches—including the one involved in this case—were replaced until after the appellee was mangled in the collision on the 3 North passway.

In this case, after the known-to-be-hazardous overhead toggle switch had been snagged, seventeen rail cars broke loose from the locomotive and careened backward down the tracks into the mine. Instead of rolling backward down the "main" line, the runaway train roared down the 3 North passway. The runaway train plowed into the three sitting passenger cars before Mr. Sedgmer could jump clear, and he suffered severe injuries.

I dissent, in part, because the majority opinion ignores the obvious hazardous nature of the overhead toggle switches that were used throughout the mine. The appellees knew these switches were an accident waiting to happen, but did nothing to replace or protect them from accidental activation.

But I also dissent because of the majority opinion's mangled interpretation of a state regulation and company rules with which the company plainly did not comply, and which form the kernel of the question that the

majority opinion should have left to a jury: did the company's failure to comply with the regulation and rules constitute an unsafe working condition *known* to the appellees?

The bunch of rules at issue in this case essentially said the same thing: inside of a mine, it is dangerous for coal miners to sit inside light-weight rail passenger cars when heavy-weight rail freight cars laden with tons of coal are using the same railroad tracks. These rules all gave the same guidance: miners are to get out of the light-weight cars, get away from the tracks, and wait in an area of safety like a crosscut or shelter hole. These rules were issued by the West Virginia Board of Coal Mine Health & Safety, McElroy Coal Company, and McElroy's owner, Consolidation Coal Company.

The appellant's whole argument is that sitting in an unmoving passenger car inside of a mine is an "unsafe working condition." State regulations and the company's internal rules all say just that, and order that miners get out of sitting passenger cars and move to safety in a shelter or crosscut.

If Mr. Sedgmer's employer had followed state regulations and the company's internal rules, then Mr. Sedgmer and the other employees would not have been sitting in the passenger cars at the time of the collision with the runaway train. It appears from the record, that if the employer had done what it was supposed to do, then Mr. Sedgmer would not have been injured. It was therefore plainly a question of fact for the jury to decide whether or not the appellees exposed Mr. Sedgmer to an unsafe working condition with deliberate intent, when it left him sitting in a passenger-carrying rail car while fully-loaded freight cars were passing on the tracks nearby.

Nevertheless, the majority opinion places itself in the position of the jury and declares its factual conclusion that "there is no evidence that Appellees exposed Appellant to an unsafe working condition." The majority opinion therefore declares that Mr. Sedgmer's injuries were nothing more than an unavoidable "accident," and then blithely declares that "no employer will ever be able to prevent all accidents, no matter what its efforts." This is nonsense.

Somehow, the majority opinion thinks that this was a freak accident that could never have been predicted. This is so even though this Court's own opinions are replete with horrific instances of miners being crushed and mangled while they were sitting inside passenger-carrying rail cars. A classic example is *Cecil v. D and M Inc.*, 205 W.Va. 162, 517 S.E.2d 27 (1999) where the plaintiff (who, like the appellant, was working for a Consolidated Coal Company subsidiary) was seriously injured when he tried to jump clear of the passenger carrier in which he was sitting before it was struck by a runaway train. *See also, Harris v. Martinka Coal Co.*, 201 W.Va. 578, 499 S.E.2d 307 (1997) (plaintiff seriously injured when passenger carrier rammed by another vehicle lacking brakes); *Beard v. Beckley Coal Min. Co.*, 183 W.Va. 485, 396 S.E.2d 447 (1990) (plaintiff seriously injured when runaway passenger carrier derailed).[1]

Government exists, in part, to encourage employers to make workplaces safer and more efficient. All branches of government—executive, legislative and judicial—should vigorously work together to make it absolutely clear that workplace injuries and fatalities are unacceptable, intolerable and 100% preventable. The state regulation and rules at issue in this case were plainly designed to further the goal of the total elimination of workplace injuries.

The appellees and the majority's opinion, however, shrug off this goal, and cast the plaintiff's injury as some sort of unforeseeable, "Rube Goldbergian" freak accident.

I refuse to be so blind. I therefore respectfully dissent.

---

1. While I was drafting this dissenting opinion, I noticed that three people were injured in a passenger-carrying "mantrip" accident in, of all places, the Beckley Exhibition Coal Mine. Apparently, the electric-motor-driven passenger carrier was climbing an incline out of the mine when a breaker failed, causing the carrier to roll backward until it struck a door. It therefore seems—contrary to the majority's opinion—that even a non-functioning exhibition mine is a dangerous place. *See* "Three Hurt at Exhibition Mine," *Charleston Gazette*, December 2, 2006.